ORIGINAL

DOC # 1

Approved: _____
JASON P. HERNANDEZ
Assistant United States Attorney

**14 MAG 1391**

Before: HONORABLE RONALD L. ELLIS
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :    **SEALED COMPLAINT**
UNITED STATES OF AMERICA          :
                                  :    Violation of
        -v.-                      :    18 U.S.C. §§ 1343 & 2
                                  :
JOHN RE,                          :    COUNTY OF OFFENSE:
                                  :    NEW YORK
        Defendant.                :
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

MERIDITH SAVONA, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation, and charges:

## COUNT ONE
### (Wire Fraud)

1. From in or about March 2005, up to and including in or about January 2014, in the Southern District of New York and elsewhere, JOHN RE, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, RE devised and carried out a scheme to defraud purchasers of art work by, among other things, selling paintings that RE falsely and fraudulently represented were authentic paintings by Jackson Pollock; falsifying the provenance for the purported Pollock paintings;

causing others to fraudulently inflate the price of paintings that RE was selling in on-line auctions by engaging in "shill bidding;" and in furtherance of the scheme, RE transmitted and caused to be transmitted interstate wire communications to and from New York, New York.

(Title 18, United States Code, Sections 1343 & 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been a Special Agent since June 9, 1996. I have been assigned to the Major Theft squad since February 2010. Prior to that I was assigned to an organized crime squad from October 1998 to February 2010. In connection to my assignment to the Major Theft Squad, I specialize in investigations concerning art theft and art fraud, and have participated in other investigations concerning financial crimes, mail fraud, wire fraud, and money laundering, among other things. From my participation in this investigation, my conversations with law enforcement officers and others, and my review of documents, I am familiar with the facts and circumstances of this investigation. Because this affidavit is being submitted for a limited purpose, I have not included in it everything I know about this investigation. Where the contents of documents and the actions, conversations, and statements of others are related herein, they are related in substance and in part.

## OVERVIEW

3. JOHN RE, the defendant, resides in East Hampton, New York. I know from interviewing RE that RE was once employed as a woodworker. I also know that RE is a painter who has created paintings that based on my training and experience investigating art crimes can be described as Abstract Expressionist in style.

4. As set forth in detail below, there is probable cause to believe that JOHN RE, the defendant, devised and carried out a scheme to defraud art collectors to whom he sold paintings in at least five ways. *First*, RE sold more than 60 purported paintings by Jackson Pollock to art collectors for approximately $1,889,390 that RE falsely represented were created by the

famous Abstract Expressionist American artist Jackson Pollock, when, in fact, as RE well knew, those paintings were fakes, i.e., not created by Jackson Pollock. *Second*, RE falsely claimed that he obtained all of the purported Pollock paintings from the basement of a single-family home in East Hampton, New York in 1999 and that the paintings' original owners had received the paintings from Pollock directly. In truth and fact, RE's representation that he obtained all of the paintings from the basement of a single-family home in East Hampton, New York was a lie that RE told his victims to give the paintings a plausible provenance, or chain of ownership, and to induce RE's victims to buy the paintings. *Third*, RE falsely represented to victims at different points in time that they had purchased the entire collection of Pollocks or nearly all of the Pollocks that RE claimed to have found in the basement. *Fourth*, in furtherance of the scheme and to avoid being caught, RE threatened, among other things, to change the provenance for the purported Pollock paintings that RE had sold to a victim to render the paintings worthless. *Fifth*, RE caused others to engage in "shill bidding" on RE's behalf to falsely and fraudulently inflate the price of purported Pollocks that RE was selling on eBay, an online auction site.

## THE VICTIMS

5. I know from speaking to an art collector ("Collector-1") that in or about 2006, Collector-1 purchased approximately twelve paintings for approximately $894,500 purportedly created by Jackson Pollock from JOHN RE, the defendant. RE told Collector-1 that RE acquired the purported Pollocks from George and Barbara Schulte's basement in East Hampton, New York in or about 1999 (the "Schulte Provenance"). RE claimed that all of the paintings were obtained directly from Jackson Pollock by George Schulte, a deceased wood worker from East Hampton, New York.[1] RE further claimed that all of the paintings sat undisturbed for decades in the Schulte's basement until RE discovered them while helping to clean out the basement after George Schulte's death.

6. I know from speaking to an art collector ("Collector-2") that from in or about March 2005 through and including January 2012, JOHN RE, the defendant, sold Collector-2

---

[1] I learned from Barbara Schulte's daughter that Barbara Schulte, George Schulte's wife, died on or about June 22, 2013.

3

approximately 58 paintings (the "Paintings") for approximately $519,890 that RE claimed were authentic paintings created by Jackson Pollock. RE told Collector-2 that the provenance for the Paintings was the Schulte Provenance.

    7. I know from speaking to a third art collector ("Collector-3") that from in or about approximately 2012 through and including approximately May 2013, JOHN RE, the defendant, sold approximately three purported Pollock paintings to Collector-3 for approximately $475,000. RE told Collector-3 that the provenance for the paintings was the Schulte Provenance.

    8. I know from reviewing emails sent and received by JOHN RE, the defendant, that I obtained pursuant to a judicially authorized search warrant, and from interviewing an art collector ("Collector-4"), that RE sold approximately one purported Pollock to Collector-4, who resided in Texas at the time. RE told Collector-4 that the provenance for the painting was the Schulte Provenance.

    9. I know from speaking to an individual who acts as the agent (the "Agent") for another art collector ("Collector-5") that the Agent and Collector-5 both work out of offices in New York, New York and use email addresses in New York, New York. I learned from the Agent that in or about January 2014, RE offered to the Agent several paintings that RE claimed were authentic paintings by Jackson Pollock. RE told the Agent that the provenance for the paintings was the Schulte Provenance.

## PROVENANCE

    10. The provenance of a work of art is a historical record of the work's creation, ownership, custody, and location over time. A complete provenance dating back to the creation of a particular work of art by an artist can help demonstrate the authenticity of the work, that is, that the work was in fact created by a particular artist, and, as a result, can increase the value of a work of art. The converse is also true. A lack of evidence about the creation, ownership, custody, and location of a work of art can reduce the work's value. A painting that has no trustworthy provenance or an unverifiable provenance is worth substantially less, or is possibly worthless, especially if the painting is purportedly by a famous artist such as Jackson Pollock. Abstract expressionist paintings, such as

4

those by Jackson Pollock, are also favored targets for forgers. A painting with a well-documented provenance is thus much less likely to be a fake compared to a painting with a questionable provenance.

## THE SCHEME TO DEFRAUD

11. As set forth in detail below, JOHN RE, the defendant, devised and carried out a scheme to knowingly sell fake Jackson Pollock paintings to Collector-1, Collector-2, Collector-3, Collector-4, and Colector-5. In furtherance of the scheme, RE lied about the authenticity of the paintings, RE lied about the provenance for the paintings, RE lied to his victims about the size and scope of the collection, RE threatened Collector-2 with economic harm in furtherance of RE's scheme and to conceal his scheme, and RE caused others to engage in "shill bidding" in online auctions to fraudulently raise the price of fake Pollock paintings that RE was selling.

*RE Lied about the Authenticity of the
Purported Pollocks and the Schulte Provenance*

12. I believe, based on what Collector-1 told me, among other things, that JOHN RE, the defendant, knew that the purported Pollocks RE sold to Collector-1, Collector-2, Collector-3, and Collector-4, and offered to Collector-5, were fake. Collector-1 told me that in or about January 2007, Collector-1 informed RE that Collector-1 had sent at least one of the purported Pollocks that RE sold to Collector-1 to an expert forensic scientist (the "Expert") who specializes in scientifically examining paintings and other collectibles for authenticity based on the composition of the materials in the painting, such as the paint, canvass, and other aspects of the painting. The Expert concluded that the paintings were not authentic, i.e., not created by Jackson Pollock because the materials in the painting were not available during Pollock's lifetime.

13. I know from interviewing Collector-1 and Collector-2 that JOHN RE, the defendant, knew at the time that RE offered the purported Pollocks to Collector-2 that the Expert had found Collector-1's purported Pollocks to be fake. I know from interviewing Collector-2 that RE did not tell Collector-2 that the purported Pollocks that RE sold to Collector-1 were rejected by the Expert.

5

14.     Despite the Expert's rejection of Collector-1's purported Pollocks, I know from reviewing an email sent by RE on or about April 18, 2007, to Collector-2 that RE told Collector-2 that RE discovered the Paintings, among others, while helping George Schulte's widow Barbara to clean out the Schulte's basement.  RE claimed to have discovered a "basement which was full of boxes, antique's [sic], and art which had been collected over many years by George Schulte."[2]  RE told Collector-2 that he bought the Paintings and other works of art that RE purportedly found in the Schulte basement from Barbara Schulte.  RE later gave Collector-2 a more detailed account of how he purportedly came to acquire the Paintings in an email dated on or about September 28, 2011.

15.     I learned from speaking to Collector-2 and reviewing emails between Collector-2 and JOHN RE, the defendant, that in or about 2011, Collector-2 grew suspicious of the authenticity of the Paintings, so Collector-2 contemplated having the Paintings examined and tested by experts.  In or about September 2011, RE tried to dissuade Collector-2 from sending the Paintings and other paintings that Collector-2 bought from RE to The International Foundation for Art Research ("IFAR") for an opinion as to the authenticity of the Paintings.  IFAR describes itself as "a not for profit educational and research organization dedicated to integrity in the visual arts."  IFAR says that it "offers impartial and authoritative information on authenticity, ownership, theft, and other artistic, legal, and ethical issues concerning art objects."  "IFAR serves as a bridge between the public, and the scholarly and commercial art communities.  We publish the quarterly IFAR Journal; organize conferences, panels, and lectures; offer a unique Art Authentication Research Service; and serve as an information resource."

16.     With respect to Collector-2, there is probable cause to believe that JOHN RE, the defendant, was concerned that the Paintings would be declared to be forgeries by IFAR because the Expert had previously declared the purported Pollocks sold by RE to Collector-1 to be a fake.  I believe that RE thus wrote the

---

[2] This sentence contains a grammatical error that was made by the defendant, JOHN RE.  Due to the number of grammatical errors in subsequent emails quoted in this Complaint, I have not followed each error with "sic" to make the emails easier to read.  All grammatical errors have been reproduced as in the original emails.

following in an email to Collector-2 on or about September 17, 2011 to dissuade Collector-2 from learning the truth about the Paintings:

    a.  "#1. I tries to make it clear not to long ago that using IFAR was NOT a good idea. I told you from horror stories I know to be true regarding IFAR. #2, I have told you as a friend and confidant that you never and I mean NEVER submit more then 1 to 3 works of art by the same artist no matter where you go. I really tried to make this clear, but you went and gave them what I can only guess is over 10 pieces. What the hell were you thinking, or were you letting someone do your thinking for you. Did you think I was wrong, because I was not." Based on my training and experience with art crimes, I believe that RE was trying to dissuade Collector-2 from submitting more than 1 to 3 works to IFAR because RE knew that if IFAR was aware of the true number of purported Pollocks that RE claimed to have obtained from the Schulte basement – an extraordinarily high number for a well-known artist like Pollock – that IFAR was much more likely to find the collection to be fake.

    b.  "I can only hope to the Lord God you didn't make the biggest mistake you could have next to using my name. #3. Why use my name when you know that I have had problems with a few world experts in my time, and I also got in trouble many years ago, and it was fake money, and that could really work against the art. People will be people and they judge the art based on who owned it in a certain respect." I believe based on my training and experience, and my review of RE's criminal history, that RE's reference to getting into trouble for "fake money" is a reference to RE's 1995 conviction in Suffolk County Supreme Court, New York, in connection with a scheme to make counterfeit U.S. currency. RE pled guilty to attempted possession of a forged instrument in the first degree in violation of New York Penal Law Section 170.30 and was subsequently sentenced. RE and his co-conspirators were found to have offered to sell counterfeit $20 bills for cents on the dollar, and equipment used to make counterfeit currency was seized by law enforcement during the investigation.

    c.  "My point is I am a bit shocked you did all these things without talking to me first. I know so far you said they gave you some indication that the pieces are doing well. That's great, but what if the aspect of how did you get so many, or how

did George Schulte get so many has been the question that I believe has at times held me and the art back from breaking free of the expert bullshit. Yes, I know we need the experts. I don't know how important the lab will come in. It might make or break every thing. If they did not pass the pieces you gave them then you would have to deal with the Pieces they didn't see, and from what my experience has taught me is that the Schulte provenance would be labeled NO GOOD through out the art world." I believe based on my training and experience, including my knowledge of how paintings are often tested to determine authenticity, that RE's reference to the "lab" is likely a reference to the scientific testing of the materials in a painting that IFAR undertakes as part of its analysis. Furthermore, I believe that RE was again expressing concern about disclosing to IFAR the total number of purported Pollocks that RE claims to have found because that information would weigh heavily against a finding that the paintings were authentic.

    17. I learned from Collector-2 that he sent 45 of the Paintings to IFAR for analysis. IFAR finished its report on February 13, 2012 and concluded that:

    a. "Following a thorough investigation, which included in person examinations of all 45 paintings by specialists and conservators, extensive provenance and art historical research, and physical examination, and selective forensic testing of the materials," that none of the 45 purported Pollock paintings were by Jackson Pollock.

    b. There was no evidence to substantiate the purported Schulte provenance: "IFAR could not substantiate the provenance provided. We could find no evidence that Pollock had any relationship with George Schulte that might explain why Pollock would have given him a work of art, much less several dozen paintings, some of which are quite large, from different phases of his career. Several members of Mr. Schulte's immediate family, as well as his close friends, moreover, informed IFAR that George Schulte never claimed to own artworks by Pollock, nor had they ever seen works by Pollock in the basement of his house."

    c. The works were not stylistically consistent with examples of authentic Pollock painitngs: "[S]tylistically, a large number of the works had many inconsistencies in facture

8

and quality with known works by Pollock, and were remarkably, and disturbingly analogous to each other in palette, composition, and overall execution, much more similar, in fact, than any of Pollock's authentic works are to each other."

        d.    The materials used to create the 45 purported Pollock paintings were consistent with forgeries: "Physical examination and forensic testing revealed anomalous and anachronistic materials within a wide spectrum of paintings in the group. Equally troubling, the application of a variety of dark liquid coatings to the surfaces of the majority of the paintings on canvas and masonite, as well as, for the works on paper, the use [of] old papers scumbled over with dark pigments to intentionally distress them still further, are strongly suggestive of an attempt to deceive."

        18.    There is also probable cause to believe that the paintings that JOHN RE, the defendant, sold with the Schulte Provenance or offered for sale were fake because the paint on at least one of those paintings was too fresh to have been applied by Jackson Pollock, who died on August 11, 1956. I learned from Collector-3 that in December 2013, he showed a purported Pollock with the Schulte Provenance ("Collector-3's Purported Pollock") that Collector-3 obtained from RE to an art dealer (the "Art Dealer") in New York, New York. Collector-3 told me that when the Art Dealer attempted to wipe away some dirt on Collector-3's Purported Pollock using his finger and his saliva, the paint came off of the painting. The Art Dealer, who specializes in Contemporary Art, which includes works by Pollock, told Collector-3 in sum and substance that wiping away the dirt on an authentic Pollock, which could not have been made any later than the date of Pollock's death in 1956, would not have caused the paint to come off of the painting. The Art Dealer told Collector-3 in sum and substance that the paint would only come off of a much more recently created painting and that accordingly, he believed that Collector-3's Purported Pollock was not made by Jackson Pollock.

        19.    Based on my training and experience with art crimes and the art market, I know that the prices that Collector-2 paid for the Paintings were well below the market price for authentic paintings by Jackson Pollock. For example, the most expensive purported Pollock that Collector-2 bought from JOHN RE, the defendant, was $60,000. Collector-2 also purchased 24 purported Pollocks for $5,000 or less each, including 10 that Collector-2

bought for less than $1,000 each. The prices paid by Collector-2 for the Paintings are many multiples below the market prices realized for authentic works by Pollock, which supports probable cause to believe that the Paintings are fake.

20. I know from reviewing emails sent and received by JOHN RE, the defendant, that from at least in or about 2009 through and including at least 2012, JOHN RE, the defendant, offered Collector-4 purported paintings by Jackson Pollock. RE told Collector-4 that the provenance for the paintings was the Schulte Provenance. On or about October 21, 2009, RE sent Collector-4 an interstate email in which RE offered Collector-4 two purported Pollocks. On or about April 13, 2012, RE again offered Collector-4 another purported Pollock via interstate email. RE wrote: "This is a very strong Pollock. Slight cracking through-out, and avery little browning on the front. More on the rear. Not bad for a 62 to 64 year old painting that was in a basement for maybe 55 of those years. I am sure the photos do not do it justice. I wish you had it in your hands." I learned from Collector-4 that he purchased one of the purported Pollocks from RE.

21. I know the following from speaking to the Agent, who was Collector-5's agent, and from reviewing emails sent and received by Collector-5. On or about January 5, 2014, JOHN RE, the defendant, caused another person to send an interstate email to Collector-5, who works in New York, New York and maintains his email address in New York, New York. The email included an image of a painting that RE later offer to sell to the Agent. RE told the Agent that the painting was an authentic Pollock and that the provenance was the Schulte Provenance. RE also told the Agent that he had several more purported Pollocks that RE claimed to have found in the Schulte's basement for sale.

*RE Lied to His Victims and Others about
the Total Number of Purported Pollocks He
Claimed To Have Found In the Schulte Basement*

22. As set forth below, I have learned from interviewing Collector-1 and Collector-2 that JOHN RE, the defendant, falsely represented the number of works that RE claimed to have found in the Schulte's basement. Collector-1 told me that RE had represented from in or about 2005 through in or about 2007, that Collector-1 had purchased the entire collection of works that RE claimed to have found in the Schulte's basement with the

exception of a few drawings. Collector-2 told me that RE represented to him from in or about 2007 through in or about 2012, that Collector-2 had purchased the entire collection from the Schulte basement, minus a few pieces RE said he sold on eBay, an online auction site.

      23.   I also believe that JOHN RE, the defendant, falsely represented the total number of purported authentic Jackson Pollock paintings that RE claims to have found in the Schulte's basement on other occasions. On or about May 14, 2014, RE told me in a consensual interview that he found over 100 purported Pollock paintings in the Schulte basement. By contrast, I know from reviewing the IFAR report prepared for Collector-2 that RE told IFAR in or about 2011 or 2012 that RE found only 62 or 63 purported Pollock paintings in the Schulte basement.

*RE Threatened His Victims to Further His Scheme and Conceal It*

      24.   In furtherance of the scheme and to avoid detection of the scheme, JOHN RE, the defendant, used economic threats to induce Collector-2 to lend RE money. I know from reviewing emails sent by RE to Collector-2 that RE impressed upon Collector-2 that RE needed money to pay his mounting bills. On or about July 18, 2011, RE sent Collector-2 a lengthy email to inform Collector-2 that Collector-2 had upset RE because Collector-2 had refused to lend RE money. RE used several expletives and threats in the email, which RE emphasized by using bolded font, all capital letters, underlining, and other stylistic means of emphasis. RE threatened to render the Paintings that Collector-2 purchased from RE valueless by further lying to others about the purported Schulte provenance.

      25.   On or about July 18, 2011, JOHN RE, the defendant, wrote the following to Collector-2 in an email: "#1. Your collection will go no where without my help. (Ever) #2. I will never show anyone the photos I have of the whole collection OR CONFIRM ANYTHING, and #3. What pieces I have left I am posting on the web and I am going to tell my story about the Schulte Collection, and how Barbara Schulte & I found Georges collection. The photos I show will only be about half the collection including some of yours which I own the image copyright to. You have pissed me off so bad that you can keep your fucking money. Good luck trying to make millions without my help. As far as I am concerned (you want to play hard ball) I can do that to. Your collection is nothing without me."

26. I learned from speaking to Collector-2 and reviewing emails between Collector-2 and JOHN RE, the defendant, that Collector-2 was able to mollify RE, but RE continued to threaten Collector-2 with actions that RE believed would devalue the Paintings.

   a. On September 15, 2011, RE sent Collector-2 an email in which RE informed Collector-2 that RE was considering sending one of the Jackson Pollock paintings that RE purportedly found in the Schulte basement to the Getty Museum in California with a different provenance, i.e., not the Schulte Provenance. RE wrote: "As far as this Pollock, I MIGHT HAVE TO SHIP IT TO CAL. FOR A WEEK OR TWO BECAUSE I HAVE AN IN FOR THE GETTY MUSEUM. THEY ARE WILLING TO LOOK AT THIS POLLOCK. IT CANT BE BAD RIGHT? I MEAN YOU KNOW [COLLECTOR-2], WE ARE GOING TO HAVE TO FACE THE FIRE SOONER OR LATER. I BELIEVE I FOUND WHAT WOULD BE CONCIDERED THE GREATEST CONTEMPORARY ART FIND IN HISTORY, however, THE Getty Museum might be given a different Provenance. Believe it or not a better one from a rich and powerful man but I will tell you about that when we talk. It was not my idea."

   b. That same day, September 15, 2011, Collector-2 responded: "Sending this piece out now would be a huge mistake and to falsify the provenance would be even worse!" Collector-2 continued: "If anyone else gets involved at this time or associates your name with the collection and especially with different provenance or catches you misrepresenting or lying about the origin of the collection or one piece that you have is going to put the nail in the coffin for good and for ever and I am not going to remedy the outcome. You will cause the loose of the century."

   c. RE replied: "Would be willing to work with you, but [Collector-2], I have to see what you are offering me, and I am still behind the 8 ball with bills. I didnt expect this piece to go your way when I brought it up, and if I was greedy you would not own any Pollock . . . from the Schulte collection. I sold that art to you at high class yard sale prices."

27. In or about late November 2013, Collector-3 consensually recorded a phone call with JOHN RE, the defendant, in which RE demanded that Collector-3 return to RE two purported Pollocks that RE claimed to have found in the Schulte basement. RE told the Collector-3: "[I] would never threaten anybody unless I'm gonna follow through. I grew up in Brooklyn, ok? My

12

mother's from the Bonanno family, which means Gambino. When I tell you to do something, you don't . . . be quiet. You don't question me. You don't talk over me. You don't disrespect me. You just do it . . . And if you got to call me back and ask one more time, your mother's going to start wondering why you stopped visiting her."

*RE Caused Others to Place "Shill Bids" on Purported Pollocks*

28.  As set forth below, there is also probable cause to believe that JOHN RE, the defendant, caused others to engage in shill bidding to fraudulently increase the price of purported Pollocks that RE was selling in online auctions. I know from reviewing emails sent by RE that I obtained pursuant to a judicially authorized search warrant the following:

   a.  In or about April 2010, RE placed a purported Pollock on the online auction site eBay. The painting was assigned item number 160421925754 by eBay (the "eBay Pollock").

   b.  On or about April 8, 2010, RE sent an interstate email to an individual ("Individual-1") who resides in New Jersey in which RE asked Individual-1 to place a bid on the eBay Pollock to raise the auction price on the item, a practice known as "shill bidding." RE wrote to Indivdual-1, in part: "Can you please place one bid on [the eBay Pollock] at $26,600. Please don't wait to do this for me. I have some new coming in and out bidding you. I have to wait for your bid. The reserve is at 35k and I just checked so no mistakes on this one. I do need your help. If I don't sell something soon I am fucking dead . . . I have to sell this Pollock."

   c.  On or about April 9, 2010, RE sent an email to another individual ("Individual-2"), also about the eBay Pollock. RE wrote: "[Individual-2], Can you please place 3 bids on [the eBay Pollock] at 17k, 23k, and $27,200. The reserve is 35k and I just checked so no mistakes on this one. I do need your help. If I don't sell something soon I am fucking dead . . . I have to sell this Pollock." On or about April 9, 2010, Individual-2 replied to RE, "all set!!."

   d.  Based on my investigation in this case and my training and experience investigating financial fraud, and art crimes in particular, I believe that RE asked Individual-1 and Individual-2 to place shill bids on the eBay Pollock to

13

fraudulently create a false and inflated market price for the eBay Pollock that RE could show to potential victims when negotiating the sale price of the eBay Pollock.

*RE's Admissions to the FBI*

29. In May 2014, I interviewed JOHN RE, the defendant, with RE's consent on several different dates. Among other things, RE said the following:

    a. RE described himself as a self-proclaimed art expert. RE said he knew the difference between representing a work to be "authentic" and a work that is "attributed to" an artist. From my experience investigating art crimes and background research that I have conducted regarding the art market, I know that if a work is sold as "authentic," it means that the work is by the hand of the artist. A work that is "attributed to" the artist means that the work is *believed* to be by the hand of the artist but there is some doubt or uncertainty that prevents the work from being described as "authentic."

    b. RE initially told me that he never sold any of the purported Pollocks from the Schulte basement as "authentic," but upon showing RE certain postings on eBay, an online auction site, in which RE was offering purported Pollocks as either "authentic" or "real," RE admitted that he sold those purported Pollocks as "authentic."

    c. RE affirmed that Collector-1 told him (RE) in or about January 2007 that the purported Pollock(s) that RE sold to Collector-1 were deemed to be fake by the Expert. RE stated that he did not tell Collector-2 that Collector-1's purported Pollocks, which share the Schulte Provenance, were rejected by the Expert. RE further stated that if he was buying fine art, that he would want to know all of the positive and negative information about the work.

    d. RE said that he would "take the weight" for anything he has done wrong but that he did not think he had done anything wrong.

WHEREFORE, deponent prays that a warrant issue for the arrest of JOHN RE, the defendant, and that he be imprisoned or bailed as the case may be.

MERIDITH SAVONA
Special Agent, FBI

Sworn to before me this
19th day of June, 2014

HON. RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK