UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

       v.                     14 Cr. 550 (PKC)

JOHN RE,

         Defendant.

------------------------------x

                               May 12, 2015
                               11:50 a.m.

Before:

               HON. P. KEVIN CASTEL

                          District Judge

                 APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
ANDREW C. ADAMS
    Assistant United States Attorney

CHRISTOPHER FLOOD
    Attorney for Defendant


Also present:  MERIDITH SAVONA, FBI
                BRET CARLSON, FBI
                KATE HADLEY, Paralegal

1          (Case called)

2          THE DEPUTY CLERK:  Government ready?

3          MR. ADAMS:  Good morning, your Honor.  Andrew Adams

4    for the United States.  With me at counsel table is Special

5    Agent Meridith Savona and Detective Bret Carlson.

6          For the Court's information, there are a number of

7    victims in the audience today.  I just point them out to the

8    Court.

9          THE COURT:  We will be getting to that shortly.

10         For the defendant.

11         MR. FLOOD:  Good morning, your Honor.  Christopher

12   Flood, Federal Defenders of New York, on behalf of Mr. Re, who

13   is seated at counsel table.  Also with me at counsel table is a

14   paralegal from our office, Ms. Kate Hadley.

15         THE COURT:  All right.  Good morning to you all.

16         Mr. Flood, the first thing I want to do is go through

17   with you the materials that I have, and the question will be

18   whether I have everything I should have.

19         I have a presentence report, recommendation and

20   addendum from probation, dated February 20, 2015.  I have a

21   memorandum from you with Exhibits A through I, dated April 28,

22   2015.  I also have from you a letter dated May 11, 2015, which

23   annexes additional letters of support.

24         I have from the government a letter dated May 5, 2015,

25   which helpfully came with a CD-ROM or DVD-ROM which contain a

1  variety of materials, which I have reviewed, including some

2  victim statements.

3         I have a letter dated May 11, which was handed up to

4  me, and it is from an individual Anders Karlsson, and I have

5  not read it, don't know what it relates to, but I will read it

6  in a moment.

7         I also have a proposed order of restitution and a

8  preliminary order of forfeiture as to specific property as well

9  as a consent preliminary order of forfeiture money judgment.

10         Mr. Flood, do I have everything I should have?

11         MR. FLOOD:  I believe you do, Judge.

12         THE COURT:  Same question for the government.

13         MR. ADAMS:  Yes, your Honor.

14         And the May 11 letter from Mr. Karlsson is a victim

15  impact statement that was given to me today.

16         THE COURT:  Thank you.

17         Mr. Flood, has the defendant read, received and

18  reviewed the presentence report, recommendation and addendum?

19         MR. FLOOD:  Yes.

20         THE COURT:  Does the defendant have any objections to

21  the facts set forth in the presentence report?

22         MR. FLOOD:  No, your Honor, other than that that's

23  mentioned within the presentence report, the second disclosure

24  mentions one of our objections.

25         THE COURT:  This relates to the nolo contendere

F5C8JOHS

1    conviction in a Texas court, is that correct?

2              MR. FLOOD:  That's correct.

3              THE COURT:  And I understand the government has no

4    objection to excluding that conviction from my consideration in

5    this case.

6              MR. ADAMS:  That's correct, your Honor.

7              THE COURT:  So it will be excluded from consideration.

8              With that one change, does the defendant have any

9    other objection to the facts set forth in the presentence

10   report?

11             MR. FLOOD:  No, your Honor.

12             THE COURT:  Does the government have any objections to

13   the facts set forth in the presentence report?

14             MR. ADAMS:  No, your Honor.

15             THE COURT:  Based upon my review, I adopt as my

16   findings of fact the facts set forth in the presentence report.

17             With regard to the guideline calculation, I propose to

18   conclude that the defendant is in total offense level 20,

19   Criminal History Category II, and that the guideline range for

20   imprisonment is therefore 37 to 46 months' imprisonment, with

21   the applicable fine range of 7500 to 5 million.

22             Any objection from the defendant?

23             MR. FLOOD:  No, your Honor.

24             THE COURT:  Same question for the government.

25             MR. ADAMS:  No, your Honor.

F5C8JOHS

1          THE COURT:  I adopt those as my guideline

2     determinations.

3          I will now give Mr. Flood an opportunity to speak on

4     behalf of the defendant.

5          MR. FLOOD:  Thank you, your Honor.

6          Your Honor, this has a very complicated history.  In

7     this case, I think a reasonable first impression that the

8     Court, taking a look at the allegations, could think that Mr.

9     Re's conduct might have come from a much more sophisticated

10    person than Mr. Re in fact actually is.

11         The history and the complexity and the nature of the

12    scheme notwithstanding, Mr. Re himself is, in fact, an

13    incredibly damaged, incredibly weakened person that we have

14    gone some distance to try and present to the Court, and I hope

15    that the attachments that we have given your Honor, certainly

16    from Dr. First, substantiate it.

17         This is a gentleman whose personal history is nothing

18    short of horrifying, and the effects of that personal history

19    on his mental state are real, and that mental state has had a

20    specific and direct effect on the offense conduct in this case.

21         Mr. Re really was uniquely, and I guess the word I am

22    searching for here is vulnerable to his own weaknesses, living

23    where he was, in the environment of Eastern Long Island.

24         If I can just indulge in the Court's patience for a

25    moment.  Eastern Long Island is the Hamptons, a place of

1  immense wealth and really striking class differences, a place

2  where Mr. Re is really on the low end of those class

3  differences, and where Jackson Pollock paintings and the sort

4  of art world out there presented an opportunity to really just

5  leap into a different world of security, which he desperately

6  needed for his family, which in the PSI sets forth the

7  incredible health struggles Mr. Re's family has been suffering

8  with for at least the last 15 years, the cancer that his

9  daughter suffered at a very young age.

10       If I could just take a moment to point out that many

11  members of his family are here in the courtroom today, although

12  his daughter, Amanda Re, who I am speaking of right today,

13  couldn't be here because she had child-care responsibilities

14  back in Eastern Long Island.  His daughter Amanda had cancer at

15  age eight and had to have a leg bone removed right at the same

16  time that this offense conduct began.  But here in the

17  courtroom today is Rhonda Re, his wife; Gloria Re, his mother;

18  Alexia Re, his other daughter; and Christopher, a close family

19  friend from the neighborhood.

20       But along with his daughter's cancer, also his wife

21  has been cancer stricken twice, a long-term degenerative

22  disease, Lyme disease, has been in the family.  His mother has

23  had some health struggles.  His father had renal failure and

24  was struggling towards the end of his life.  So the concept

25  that Mr. Re could help was right there as a massive temptation,

1   and so many fraud cases begin this way.

2           Jackson Pollock, as I am sure the Court has seen in

3   the media, and perhaps in other cases, and I think some of the

4   materials even perhaps presented by the government, but I know

5   presented by us, this artwork is fraught with contested

6   authenticity.  I am not an expert, but certainly there is a

7   contest out there about which are authentic Pollocks and which

8   aren't.  And Mr. Re fell victim to his own hopes and dreams

9   about how, perhaps, he could leap into a place of greater

10  security for his family here.  But it's related to his need to

11  be somebody else, to be somebody, that's directly related to

12  the struggles that he went through as a child and the

13  incredibly fraught mental illness that Dr. First identifies.

14          Dr. First is not the kind of psychiatrist who is just

15  going to sign off on this kind of diagnosis.  He is hardly

16  somebody who is a fly-by-night physician.  He took a long look

17  at Mr. Re.  And the government's attempts, enthusiastic as they

18  are, to suggest that Dr. First should be ignored, as he only

19  talked to Mr. Re and his family, that's just what psychiatrists

20  do.  I don't know who else he should have talked to, perhaps

21  the victims in the case, I don't know.

22          Dr. First talked to Mr. Re, as he should have, and he

23  reviewed Dr. Friedes' notes and records as he should have.  And

24  he found that Mr. Re's issues are real, and they are

25  substantial, and they are long held, and they are extremely

1    unique.  And Mr. Re's conduct here related, again, to this need

2    to fill a hole in his personality.  It's almost fabulous to try

3    and invent this provenance to his life, to become something, to

4    believe in something, and, really, when Dr. First is talking

5    about the submarine, the Deep Quest, and there is a moment of

6    great candor between Mr. Re and Dr. First about the Deep Quest,

7    which isn't the Deep Quest, it's a mockup of a movie prop of a

8    submarine that looks like the Deep Quest, but it's not the USS

9    Deep Quest which has great historical significance and is in a

10   museum on the West Coast.

11             THE COURT:  In the state of Washington.  And he said

12   to Dr. First, I wanted it to be true.

13             MR. FLOOD:  I wanted it to be true.

14             THE COURT:  I have read it.

15             MR. FLOOD:  So much of that underlies exactly what Mr.

16   Re's offense conduct is about about these paintings.  He

17   believed and wanted this to be true.  Because it would make him

18   the person who actually was close to Jackson Pollock, and

19   actually was meant something in East Hampton, and was cool with

20   the art world, and was actually friends with Brad Pitt.

21             But when he got this money, what did he do with it?

22   He tried to become somebody different than actually who he was.

23   He didn't just get different color contacts.  He went to Jordan

24   and tried to change his eye color.  This is a person who is

25   trying to become somebody different, trying to become somebody

1 || actually substantial.

2 ||          THE COURT:  Let me ask a basic question.

3 ||          MR. FLOOD:  Sure.

4 ||          THE COURT:  Your client has not objected to the facts

5 || set forth in the presentence report, and I have therefore

6 || adopted them as my findings of fact.  The Jackson Pollocks and

7 || the Willem de Koonings are fakes, correct?

8 ||          MR. FLOOD:  To the extent that we have any idea, yes.

9 ||          THE COURT:  Where did he get them from?  Who painted

10 || them?  How did he come in possession of them?

11 ||          MR. FLOOD:  As he said in his --

12 ||          THE COURT:  He declined to discuss his offense conduct

13 || with the office of probation on the advice of counsel.

14 ||          MR. FLOOD:  That's right.

15 ||          THE COURT:  So I am asking the question.  You can

16 || answer it or refrain from answering it.

17 ||          MR. FLOOD:  Your Honor, as he said in his allocution,

18 || he found them in a storage bin in Manhattan.

19 ||          As Mr. Re said to me, West East is the name of the

20 || storage place in Manhattan.

21 ||          THE COURT:  I don't even know what that means, find it

22 || in a storage unit.  Find it in his storage unit?  Find it in

23 || somebody else's storage unit?  Find it in a hallway of the

24 || storage company?

25 ||          MR. FLOOD:  The storage units are auctioned,

1  typically, when they are no longer paid for, and people obtain

2  the storage units, and then once they obtain the storage units,

3  they get what is inside them.

4          THE COURT:  And?

5          MR. FLOOD:  And inside them was these paintings.

6          THE COURT:  You left something out.  Someone purchased

7  this at an auction or this man purchased it at an auction?

8          MR. FLOOD:  I am hearing this out of my right ear and

9  speaking out of my mouth.  So if I could just have a moment.

10         THE COURT:  Sure.  Take your time.

11         (Pause)

12         MR. FLOOD:  So according to Mr. Re, his brother,

13 Charles Re, was purchasing storage units for a living at an

14 auction, which is not uncommon, and they purchased this unit

15 and that's where they obtained the painting.

16         THE COURT:  Wouldn't there be documentation of that

17 story if that were true?

18         MR. FLOOD:  I would expect so.

19         THE COURT:  So your client adheres to the possibility

20 that these are Jackson Pollock originals, is that what I am

21 hearing today?

22         MR. FLOOD:  No, your Honor.  We are somewhat

23 bewildered by the position the government took in their letter,

24 because what they ignored in their letter was the clause that

25 Mr. Re stipulated to on page 22 of the transcript of the plea,

F5C8JOHS

1    in which he specifically disclaimed the authenticity of the

2    paintings.  That was part of the plea agreement, and it's in

3    the PSI as well.

4         So, they pointed out something about 2005, saying that

5    that was somehow artfully crafted.  That's the indictment.  The

6    indictment says from 2005 forward, and so he allocuted to 2005

7    forward, which on advice of counsel, which is exactly how the

8    work is done in this district.  That's not artfully crafted by

9    Mr. Re; it's the federal defenders advising Mr. Re what to say

10    because it tracks the indictment.  There is nothing about him

11    playing fast and loose about language there.

12         And then the specific language on page 22, and it's in

13    the government's exhibit, where Mr. Adams says it is a unique

14    extra piece to the allocution in this case, we are asking for a

15    stipulation that says nothing that was ever sold was authentic.

16    That's exactly what he said.

17         THE COURT:  What did Mr. Re do with the money?

18         MR. FLOOD:  It's been wasted between trips to Jordan,

19    spent on refurbishing this ridiculous submarine.

20         THE COURT:  He says he spent a million dollars on

21    refurbishing the submarine, but he was unable to produce any

22    documentation for that.

23         MR. FLOOD:  Over the course of years.  It was down in

24    a shipyard in Galveston I believe.

25         THE DEFENDANT:  Pier 77.

1         THE COURT:  There is no invoices for that.

2         THE DEFENDANT:  I never got invoices from Rick Ryan,

3    the owner of the marina, but if I knew I had to have them, I

4    would have had them.

5         THE COURT:  The presentence report was issued in

6    February.  It notes that the defendant had not come up with any

7    documentation for the claim.  It's been available to be

8    reviewed by counsel.  And if anybody had any documentation that

9    they wanted to provide, having read the statement in the

10   presentence report, presumably, they would have provided it.

11        What do I make of the fact that according to the

12   presentence report, the defendant disclosed an automobile, a

13   Dodge Viper, to the marshal service, but didn't list it on his

14   assets.

15        MR. FLOOD:  He sold the Viper.  I have asked him about

16   that.  The 2006 Viper, he had sold it before the --

17        THE COURT:  When that showed up in the presentence

18   report, did anybody tell probation that or give them some

19   support for that?

20        MR. FLOOD:  No, your Honor.

21        THE COURT:  Go ahead.

22        MR. FLOOD:  Well, where do we pick up again?

23        Can I have a moment?

24        (Pause)

25        MR. FLOOD:  Your Honor, the best that I can understand

1   Mr. Re's net worth right now, having been to his household, is

2   its definitely in the red.  I have walked the grounds of their

3   home.  It is small, to say the least.  It's crowded.  And to

4   the extent that there are any assets, it's the submarine, which

5   is a strange statement indeed to be saying out loud.

6           Mr. Re himself is on a battery of medications dealing

7   with the psychiatric issues, and that is a relatively recent

8   development in his life.  As he said in his letter to the

9   Court, which I am sure the Court has studied well, I think he

10  says this kind of thinking, sort of consequential thinking, has

11  come relatively late in life.  And I think that's a candid and

12  true statement from him.  He has lost a lot behind his offense

13  conduct in this case.

14          From the frauds here, he may have gained money, which

15  from our ability to discern is gone, but he did lose

16  relationships.  He lost friendships.  He did consider these

17  people to be friends.  And one thing that we know from the

18  letters that are submitted, and it is part of the complexity

19  that Mr. Re presents, is that he is an incredibly valuable

20  person to the people that care about him and he cares about.

21  He is a valued father, husband, son.  As a member of his

22  community, their home is open to people who need help.  And

23  possibly because Mr. Re has needed that help and didn't get it

24  when he needed it, he is an incredibly generous person, to the

25  point of almost irrationality, giving away the things that he

1    needs to people who are in need, homeless people.

2          To be completely candid, reading some of the letters,

3    when I was reading them they didn't sound true to me, until I

4    started reading them in sequence, like him going into burning

5    cars to pull people out.  That sounded entirely self-serving,

6    until reading it from the perspectives of other people saying,

7    no, this is actually true, this really happened.  And Mr. Re,

8    and his character, really is the type of person who would go

9    into a burning car to pull someone out, a stranger.  And how to

10   harmonize that with the character that is presented so dimly in

11   the victim statements, the only way that it makes sense, from

12   the defense perspective, and I think it is really true, is the

13   sort of self-aggrandizement that Dr. First speaks to.

14          So where does that leave the Court?  Because I think,

15   obviously, the Court has the power to just imprison Mr. Re, and

16   I know that there are plenty of angry victims here who want to

17   see that happen, but I don't think that solves any problems.

18   That certainly punishes, but is that just punishment, because

19   where does that leave us?  And where does that leave Mr. Re and

20   will he get the proper psychiatric treatment he needs in

21   prison?  I sincerely doubt it.  And will that really address

22   the underlying causes of this significant problem that brought

23   him to this issue?

24          We strongly urge the Court that it won't, that what we

25   propose is really the solution here.  If some form of directed

F5C8JOHS

1  punishment, be it home confinement, a powerful message through

2  community service that builds on the true character that John

3  Re has, with the requirement that he continue the psychiatric

4  treatment that he truly needs, will answer the issues that

5  actually caused this fraud and will allow him to work.

6  THE COURT:  Let me say for the record, for both the

7  benefit of the government and for defense counsel, I am

8  considering a sentence outside the advisory guideline range.  I

9  have considered and will consider one below the advisory

10  guideline range, and I have and will consider one above the

11  advisory guideline range.  So I want to state that for the

12  record to the extent that is relevant to either set of counsel.

13  MR. FLOOD:  So, obviously, in light of the Court's

14  comment, we are strongly urging the Court to consider below the

15  guideline range.  We do not feel that prison is appropriate

16  here.  The issue is again what brought Mr. Re to his conduct.

17  And where I want to end is where I really began.  This is a man

18  with severe mental health issues that are the product of

19  immense childhood trauma, which I have gone on at length, or

20  Dr. First really went on at length on paper, and for the

21  benefit of the remaining privacy Mr. Re has I am not going to

22  belabor in public here, but I know the Court understands what I

23  am talking about.  It was violent and persistent and absolutely

24  justifies the kind of mental break that Mr. Re certainly has

25  had.  And that mental break, joined to all the other pressures

1    in life, I am not saying it's an excuse, but it's an

2    explanation for this kind of offense conduct.

3           It is one thing if he is just out there trying to find

4    a way around legitimate employment to try and create a fraud to

5    make money.  You say, OK, deterrence has its maximal value for

6    white-collar crime.  That's one thing.  But that's not the

7    situation Mr. Re presents.  We have a mental health crisis that

8    Mr. Re is.  He is a persistent mental health crisis, and he can

9    get the right treatment, and he is in it now, and to disrupt

10   that will present problems later.

11          So the invitation to incarcerate for how long?

12   Forever?  Even as stern as I know the Court has been in the

13   past, we can't do that forever.  The point is to deter.  And

14   the key ingredients for deterrence for Mr. Re, for specific

15   deterrence, the first ingredient for that is contrition, right?

16   The conscious awareness that he has done something wrong.  And

17   this man has been lacerating himself for the entire time that I

18   have been representing him.  His knowledge that he has done

19   something wrong, the pain that he expresses in our

20   consultations, it's made it across the page from what he has

21   lost and what he has done to other people, the loss of his

22   personal sense of honor is very real and very candid.

23          So, for as much as I think the defense and government

24   have not quite met eye to eye in our submissions, I really

25   think there is a lot more clarity here about who Mr. Re is and

1   the responsibility he has taken, and I think that really points

2   towards a substantial departure from the guidelines, a

3   direction of nonincarceration, mental health treatment, and

4   allowing this man to be there for his family who need his help,

5   to build towards restitution, which, by the way, the submarine

6   is not an insubstantial asset, but allow him to pay back the

7   wrongs that he has done, which he wants to do so badly, and to

8   continue that momentum.  His means are modest, but he wants to

9   be able to do that.

10          If I could just have a moment.

11          (Pause)

12          MR. FLOOD:  Thank you, your Honor.

13          THE COURT:  Thank you, Mr. Flood.

14          Mr. Re, this is your opportunity to speak, to address

15   the Court directly, to bring to my attention any facts or

16   circumstances that you believe I should take account of in

17   passing sentence upon you today.  If there is anything you want

18   to say, Mr. Re, this is the time to say it.

19          THE DEFENDANT:  I have been having a pretty hard time

20   lately thinking about all of this.  I am 55 years old.  No

21   55-year-old wants to go to jail.  I did something wrong.  I

22   lied.  I know what I did.  I also know that I am not going to

23   try and fight nothing here, but I could say to you that I have

24   been fooled many times myself.  I have lots of fake art in my

25   shed that I can never sell again because I know it's fake, and

1    I bought it. I understand what my victims must feel. I had a

2    love for John Szemansco, and especially Peter King, he was a

3    very good friend of mine, and now I don't know if I will ever

4    even talk to him again.

5         I can honestly say that I didn't know if they were

6    real or wrong. I didn't. And I didn't know who to go to with

7    them. So I asked Vered Gallery in East Hampton if they were

8    right with one of the de Koonings. I tried to get some advice

9    when I first found them, before I sold one. And they bought 22

10   de Koonings from me saying that they were authentic, and some

11   were authenticated, some weren't, some were knocked down just

12   like those.

13        I was a woodworker. I had over 300 sales of art and

14   antiques, and especially art books, on eBay, and I have never

15   had one negative complaint from a buyer. And they are allowed

16   to leave the complaint or the compliment to their satisfaction

17   on eBay for everyone to read to see what kind of buyer you are.

18   Are you an honest buyer? Are you a con man? If you don't have

19   any feedbacks, and obviously you keep changing your name

20   because you are a con man. I stayed with the same two accounts

21   for 12 years and had a very good reputation, and I have

22   excellent feedbacks, over 300, which I should have brought them

23   but I didn't. If you want them, I will mail them to you

24   directly tomorrow if you feel you want to see them. I have

25   never had a person come to me and say, why did you sell me this

1    fake?

2         Then I had an unfortunate incident where I decided

3    that I would take art for the Pollocks instead of money.  And I

4    found myself in a situation where I accepted 24 Picasso's, that

5    would have been worth 50 to 60 million dollars if real, and to

6    me they looked very real, and I thought this was a great thing.

7    I thought, wow, people are going to get rich.  I have always

8    retained a percentage of what I sold.  I have never read of

9    anybody that was trying to rip somebody off that tried to stay

10   married to who they sold the art to.  And all those Picasso's

11   came from collector number two, the main reason I am here

12   today.  He gave me fake art and traded it for my art, and all

13   his art turned out to be fake too.

14        And we talked about it and I told him, don't worry

15   about it, because we knew we were taking a risk.  We never knew

16   that these were real or right, and he agreed with me, and I

17   have the e-mail.  And that was a communication that John

18   Szemansco never reflected to the Court, that I made clear, I

19   don't know, you're buying these on your own, and if I were you

20   I would do some homework, and he never did.  I didn't want to

21   hurt John.  John is divorced with a single son, and he is a

22   good man, and everybody I have dealt with, to me, seemed to be

23   at least trying very hard to be legitimate and straightforward

24   with me.

25        I am not what these papers say I am.  I will tell you

1   right now I am not what these papers say I am.  I swear to you

2   on my grandson.  These papers are horrible.  Every one of these

3   reports that talk about me are horrible.  They make me out to

4   be some guy that wants to rip people off and go out there and

5   steal pocketbooks from old ladies.  And I'm not that person.

6          Sorry for raising my voice, your Honor.  I'm sorry.

7   But I have got to tell you, you want to hear it from me, I will

8   tell you, OK.  I have given more to people homeless, and I have

9   saved more lives and risked my life for people, and now I am

10  going to go to jail for selling fake art that I didn't even

11  know was fake when they were giving me fake art back.  I will

12  make full restitution.  I tell you right now, your Honor, I

13  will make restitution to everyone that wants it.  I will do it

14  in a shorter period of time than you think.  I will.  I will

15  work like a dog.  I will do whatever I have to, legally

16  obviously.

17         I don't know what else to do.  I have been crying

18  every day with my family for the last month.  OK?  My daughters

19  tell me they don't want me to leave home, and I say, I can't

20  help it, they are going to put me in jail.  What am I supposed

21  to do?  I didn't know these damn things were fakes.  And you

22  know what, there's laboratories that say they are real.

23         Meridith Savona came to my house and showed me a thing

24  where I said authentic on eBay.  She didn't know it had a

25  forensic lab report.  She told the newspaper I was mentally

1 ill.  People were making fun of me to my daughters because they

2 said your father is a retard or something.  You're not supposed

3 to tell newspapers about my mental illness.  That's against the

4 law.  I have been stepped on like a cockroach from everybody in

5 this investigation.  I am excluding you, your Honor, of course.

6           If you can see it through somehow to just -- I will

7 make an agreement with you, your Honor, that if I didn't follow

8 through with everything that you wanted me to do, then you know

9 what, you can throw me in jail for whatever time you want.  But

10 if you just give me one chance to make up for this, and make it

11 right, I will make you proud.  I will make you glad that you

12 made that decision.  I will.  I will do it legally.  I will do

13 what you want me to do.  I will make it better.  But I can't

14 make it better in jail.  What am I going to do in jail?  I am

15 not going to go to jail at 55.  They are going to end up

16 locking me up in some crazy ward because sometimes -- I just

17 forgot what I was saying.

18           Give me five years' house arrest and watch me for ten

19 years.  I don't care.  You will see I will not make any more

20 mistakes.  This is the biggest lesson of my life.  And I have

21 made mistakes before, and you know it, I know you do.  I am

22 ashamed that I didn't know.  I should have taken the time and

23 done some homework.

24           The storage unit was also filled with a lot of African

25 art.  I sold some of that too and it turned out to be all real.

1  But it wasn't very expensive stuff; it was a low price, 2,000,

2  3,000, 500.  The idea that that art was real led me inside to

3  say that everything in this unit, I just hit the jackpot of my

4  life, God just put his hand upon me and said, I am going to

5  bless you with this storage unit, and now here I am facing

6  jail.

7       I wish my brother was here to tell you how excited I

8  was.  I had tears in my eyes.  I thought I would be able to --

9  I was going to start a homeless foundation because I have

10  something about the homeless, because when I was younger I had

11  a hard time and I left home and I lived in Penn Station for a

12  while.  I was homeless, and I know what it is like for these

13  people to be out there.  I am just adding that because I need

14  you to know what I do and who I am.  And I know I make a lot of

15  mistakes.  I just heard on the news the other day that the

16  average American commits three felonies a day and doesn't know

17  it.

18       I am trying to find the correct words so that you take

19  into your heart, just take into your heart that I will make

20  this right.  I can make this right.  I am not some 23-year-old

21  kid that ripped off a bank or a drugstore.  I have a lot of

22  intelligence.  I am a smart person and I have this film

23  business that somebody wants to start with me.  It would be an

24  amazing success and I could make restitution.  I can try and

25  rebuild my house, which is literally sinking.  Right now there

F5C8JOHS

1    is no gas in my tanks for hot water and the electric is going

2    to be shut off today, and I can prove that to you.

3            I am in a whirlwind. I am in a perfect storm, as Jeff

4    Marder said in his letter, and I can't get out. I can't get

5    out without your help. It's the only way. Everybody is going

6    to tell you how bad I am, what a bad person I am. Why? I know

7    I threatened Carl, but I never followed through with a threat

8    in my life, not one.

9            Your Honor, my father told me never to beg no matter

10   what, take your licks like a man. I am going to ask you as a

11   man to man, please just see more than what is in front of you,

12   please look further. All I ask is give me another chance.

13   That's all I ask. You will not regret it. You will not regret

14   it.

15           THE COURT: Thank you, Mr. Re.

16           THE DEFENDANT: Thank you, your Honor, for listening.

17           THE COURT: This is the government's opportunity to

18   speak, and I will hear from the government whether there are

19   any victims who wish to be heard orally. I have the written

20   victim statements. I do want to take a moment to read the one

21   that was handed up today.

22           (Pause)

23           THE COURT: How does the government wish to proceed?

24           MR. ADAMS: Thank you, your Honor.

25           I will begin just by identifying the victims who are

F5C8JOHS

1    in the courtroom today.  Mr. McMaster, whose letter you have.

2    It is my understanding that Mr. McMaster wishes to just rely on

3    the letter that was submitted to you.

4          Mr. Szemansco is also here in the courtroom today, as

5    is Mr. Karlsson.  I checked with them before your Honor took

6    the bench.  They were still considering whether they wished to

7    say anything.

8          THE COURT:  You want to take a moment to find out?

9          MR. ADAMS:  Yes, sir.  Thank you.

10          (Pause)

11          MR. ADAMS:  Thank you.  Mr. Szemansco would like to

12   say a few words to the Court.  Mr. Karlsson will rest on his

13   letter.

14          THE COURT:  Mr. Szemansco, if you wish to be heard,

15   you can come right up to the podium here.

16          Just please state your full name for the record, first

17   and last name, and spell it if you will.

18          MR. SZEMANSCO:  John Szemansco, S-Z-E-M-A-N-S-C-O.

19          THE COURT:  Please proceed.

20          MR. SZEMANSCO:  Thank you for giving me the

21   opportunity.

22          I am glad I got a chance to hear Mr. Re speak because

23   it reminded me of how convincing he is not only in the

24   statements that he makes, but how convincing he was regarding

25   the art over the period of years that I have known him.

1    A couple of things have come to mind, and it's

2   interesting regarding the storage shed, because Mr. Re knows

3   very well how important provenance is, and knowing him he would

4   have gone to the end of the earth to find out where those

5   paintings came from instead of planting the shills in

6   provenance.

7    It's not just the fact that I lost 32 years of my

8   retirement.  I will survive that.  It's not the fact that I

9   just pulled my third house out of foreclosure.  I am surviving

10   that.  I think what is more important for you to consider, your

11   Honor, is that the art world needs to be sent a message, and

12   people who also create false art knowingly, as John Re did

13   know, that needs to be sent very clear with a strong sentence

14   and a maximum sentence for him.

15    John Re is a very smart individual.  He is very

16   calculating.  John Re knew exactly what he was doing.  He

17   ordered a lot of notarized letters and statements regarding the

18   provenance.  He never wavered over it, over anywhere from five

19   to six years.  He lived it, breathed it, and I believe that at

20   this particular point he should pay for it.

21    If John Re gets back out on this street, if he doesn't

22   do this with art, he is going to do it with something else.

23   His intentions of paying back his victims, the fact that a

24   woodworker is going to pay back three, four million dollars,

25   after he pays taxes on that money, it's impossible.  I believe

1     also John Re has that money; not all of it, I think he spent a

2     lot of it, but he at one time told me they will never find the

3     money. He has got it buried. Don't kid yourself.

4         I am really and truly hoping that there is justice

5     here today, not only for myself, but for all the people in the

6     art world who are fighting people like John Re, who are

7     introducing these type of paintings and drawings that is

8     confusing, manipulating, and victimizing a lot of other people

9     that may not even find it out for years and years. So I am

10     just asking for a maximum sentence on this, your Honor.

11         THE COURT: Thank you very much, sir.

12         I will hear from Mr. Adams.

13         MR. ADAMS: I was going to speak a bit about the

14     victims in this case, who actually purchased art, and the

15     millions of dollars that were spent on Mr. Re's paintings, but

16     I think Mr. Szemansco eloquently spoke to that point.

17         What I would like to focus on instead, your Honor, is

18     what, to me, is the lasting image of this case and sort of an

19     emblematic image of this case. It is a breakfast table at a

20     house in Long Island sometime in 1999. Barbara Schulte is

21     there, it's her home, which is an unpretentious home in East

22     Hampton. Ms. Schulte had cooked breakfast, she made muffins,

23     and she was serving John Re and another woman, who was an art

24     dealer. Mr. Re mentioned that person just a moment ago, a

25     representative of Vered Gallery. And they were in Barbara

1   Schulte's house in 1999 having breakfast.  The art dealer was

2   there to hear firsthand about the Schulte provenance, and she

3   did.  Mr. Re sat there.  Ms. Schulte sat there.  And they

4   discussed the treasure-trove of artwork in the Schulte

5   basement, and the Vered Gallery walked away with the impression

6   that that provenance was real and that the artwork that Mr. Re

7   was offering was substantiated.

8          That story is not a figment.  That story is not a

9   fantasy.  That has been told to the government and agents of

10   the government by Mr. Re himself.  It's been told to the

11   government by the Vered Gallery owner.  And it was mentioned on

12   a phone call from Barbara Schulte to a representative of the de

13   Kooning Foundation, and there are notes of that call that I

14   provided as an exhibit to my sentencing submission.  That

15   meeting happened.

16          To me, the picture of that conversation says a lot

17   about the nature of this crime and the nature of this

18   defendant.  Mr. Re was willing to sit down across the table

19   from Barbara Schulte, elderly, slipping a bit in her mind at

20   that point, and to convince her that there was a trove of

21   artwork in her own basement.  And for whatever reason, whether

22   because she herself believed it at that point or because she

23   didn't have the power to contradict him, she sat there and was

24   manipulated over and over again by Mr. Re so that he could make

25   millions of dollars through the sale of these paintings.  It's

1  an image of exploitation.  I think it speaks directly to the

2  nature of this defendant and the nature of this crime that took

3  place over the course of over a decade.

4      A lot of people lost a lot of money in this case.  But

5  I think the exploitation of Barbara Schulte, in her state at

6  that time, and the memory of her husband, is really at the core

7  of this defendant's crime.  I think his nature, his

8  characteristics, the nature of this crime, the pain that was

9  wrought on his community, on the victims in this case, all of

10  those speak towards an incarceratory sentence, and we stand by

11  our recommendation that the guideline stipulation is eminently

12  reasonable in this case.

13      Thank you.

14      THE COURT:  This is the Court's statement of reasons

15  for the sentence to be imposed on John Re.

16      In sentencing the defendant, I have considered all of

17  the materials that I referenced at the outset of this

18  proceeding.  I have considered the very thoughtful and extended

19  comments of Mr. Flood orally today, the statement of Mr. Re,

20  the statement of Mr. Adams, and the statement from the victim.

21  I have considered all of the factors under Section 3553(a).  I

22  need not recount all that I have considered, but I will touch

23  on some of the matters that I have considered.

24      There is no question that John Re suffers from a

25  mental illness.  Millions of Americans do, and they do not

commit criminal acts because of their mental illness.  I am

convinced that John Re committed his crimes not as a result of

his mental illness, perhaps in part as a result of a desire to

feel grandiose, but as I will say a little bit more about Dr.

First, Dr. First himself states that while Mr. Re's criminal

behavior does not appear to be a direct result of his

psychiatric disorder, there is little question that these

disorders had an impact on his behavior.  I think that is a

fair statement.

John Re is a facile liar.  I say liar because lying

has been a way of life for over a nine-year period.  I say

facile because he planned his deception well and was reasonably

successful in carrying it out.  He entered a plea of guilty to

planning and engaging in a nine-year scheme to defraud persons

into believing that they were purchasing original works of

Jackson Pollock and Willem de Kooning with a provenance that

made them real, when in truth the provenance was a lie.  He

sold 74 paintings under false pretenses, and the total amount

of restitution owed by Mr. Re is $2,225,807.

To effectuate the scheme, Re had to come up with a

plausible story of how he acquired the paintings.  Barbara

Schulte was a convenient source of a story.  Re repeatedly told

victims that the paintings were given to George Schulte, a

woodworker and antique restorer living and working in East

Hampton, not far from where Pollock and de Kooning lived.

Pollock died in 1956 and de Kooning in 1997, both were members
of the New York School of Abstract Impressionism.

Re claimed that after the death of George Schulte, he
had done some work for Barbara, including clearing her basement
where the paintings were found.  Re claimed that he had either
purchased or was given the paintings by Barbara.  It is
undisputed that Barbara was suffering from dementia, although
the degree and consistency of her condition are in dispute.
She died in 2013.

Re produced documentation purportedly signed by
Barbara showing a lawful transfer to Re.  The statements about
the provenance of the paintings was a pack of lies.  In 2006,
he sold 12 fake Pollocks to one art collector for $894,500.
The collector later confronted Re after a forensic expert
determined they were fakes.

From 2005 through January 2012, he sold 58 purported
Pollocks to another collector for $519,890, a price well below
market.  This second collector had the works examined by the
International Foundation for Art Research, who confirmed that
the 45 submitted paintings were fakes.

I have listened to the audio recording of Re's
interaction with the second collector.  Re sounded in control
and lucid.  His lies benefited from facial plausibility.  He
showed supposed empathy for the victim, but then tried to
appeal to greed.  He argued that keeping quiet was the victim's

1  best strategy for maintaining the value of the paintings and

2  would also enable him to make restitution because he wouldn't

3  be found out by law enforcement.  At times he became a bully

4  when he realized he was cornered, and this is said to be

5  evidence of his pervasive mental illness.

6          A third collector bought three fake Pollocks for

7  $475,000, and was later threatened with bodily harm if he did

8  not return two of the paintings.

9          Re sold one fake Pollock to a fourth collector

10  residing in Texas.  He offered to sell a Pollock to a fifth

11  person, an art broker, in January 2014, and he also offered a

12  fake Pollock on eBay using shill bidding.

13          John Re is 54 years of age.  He is married with

14  children aged 19 and 25.  He was the victim of sexual abuse at

15  the hands of a family member and others as a child.  He has a

16  long string of convictions dating back to age 20, disorderly

17  conduct, assault in the second degree at age 24, escape from

18  custody at age 27, criminal possession of stolen property at

19  age 30, aggravated harassment in the second degree and false

20  report of an incident at age 32, arising from a false bomb

21  threat after he was laid off from a retail job, attempted

22  possession of a forged instrument at 35, and other convictions.

23          He owns a submarine, which he calls Deep Quest, that

24  he purchased for $55,000 and now the value is at $250,000.  It

25  is docked at a marina in East Hampton and is the subject of a

1    restraining order from this court.  He claims to have spent a

2    million dollars to refurbish the submarine.  A financial

3    picture of Mr. Re's holdings is difficult to establish, in part

4    because he has never filed a tax return.

5        Dr. First, a forensic psychiatrist, has diagnosed him

6    with dissociative identity disorder, which at an earlier point

7    in time was known as multiple personality disorder.  First met

8    the defendant after his arrest in this case and had two

9    face-to-face sessions with him.

10        Notably, on the advice of counsel, Re declined to sign

11   a HIPAA release that would have enabled probation to review his

12   psychiatric records.

13        First, however, did speak to Re's physician, who

14   reported that Re was under his care since 2001.  I note that Re

15   told probation that he first sought counseling with this

16   doctor, Dr. Friedes, in 1999.  Re acknowledged that a Dr.

17   Bernie saw him for 12 sessions in the mid-2000s, but did not

18   accept the notion that he suffered from dissociative disorder.

19        In a moment of candor with Dr. First, Re said as

20   follows:  "I lied.  I will say things to make myself look good

21   even if they are not true.  I am smart enough to create a

22   situation or an atmosphere where it seems to be true.  Not big

23   lies.  Not lies that are really evil."

24        As I have said, I accept that Mr. Re suffers from a

25   mental illness.  I also accept that his wife is ill and his

adult children have conditions requiring treatment.  The fact

that they have stood by him speaks well for Mr. Re.  And I also

note that there have been various points in his life when he

has engaged in charitable acts towards other human beings,

including a victim of a car crash and many homeless people.

As demonstrated by the lengthy audio recordings, John

Re was able to persuade, cajole and parry with his victims.  On

the advice of his counsel, he declined to discuss his offense

conduct with probation, as is his right.

Simply put, John Re is a con artist and a swindler.

He excels at the art of manipulation and deception.  He knew

exactly what he was doing.  He deserves just punishment.  The

public does need to be protected from this man.  And this

sentence should send a message to other persons who would be

inclined to engage in a get-rich-quick scheme using fake art.

Principally, based upon the length of time of his

deception and the depth of its planning, a nine-year period

where he had ample time to consider and reflect on his actions,

I conclude that a sentence somewhat above the advisory

guideline range is appropriate.

The statutory provision is up to 20 years'

imprisonment.  The guideline range in this case is 37 to 46

months.  And I intend to impose a sentence of 60 months'

imprisonment, three years' supervised release, waive the fine

based on limited assets, limited earning ability and the need

1  to make restitution, impose restitution in the amount of

2  $2,225,807, and impose forfeiture and a special assessment of

3  $100.  The foregoing is, in my view, sufficient but not greater

4  than necessary to achieve the purposes of Section 3553(a).

5          Does the defendant or his counsel have any objections

6  to the Court's proposed sentence or to the statement of reasons

7  for that sentence?

8          MR. FLOOD:  We do object, your Honor.

9          THE COURT:  Same question for the government.

10          MR. ADAMS:  No objection, your Honor.

11          THE COURT:  The defendant will please stand and I will

12  impose sentence.

13          John Re, it is the judgment of this Court that you are

14  hereby remanded to the custody of the United States Bureau of

15  Prisons to be imprisoned for 60 months.  Following release from

16  imprisonment, you shall be placed on supervised release with

17  the following terms and conditions:

18          You shall not commit another federal, state or local

19  crime.

20          You shall not illegally possess a controlled

21  substance.

22          You shall not possess a firearm or destructive device.

23          You shall refrain from unlawful use of a controlled

24  substance.

25          You shall submit to one drug test within 15 days of

1    placement on supervised release and at least two unscheduled

2    drug tests thereafter.

3         You shall cooperate in the collection of DNA as

4    directed by probation.

5         The standard conditions of supervision 1 through 13

6    are imposed with the following special conditions:

7         You shall participate in a mental health program

8    approved by the probation office and shall continue to take any

9    prescribed medications unless otherwise instructed by the

10   health care provider.  You shall contribute to the costs of

11   services rendered not covered by third party payment.

12        The Court authorizes release of available

13   psychological and psychiatric evaluations and reports to the

14   health care provider.

15        You shall provide probation with access to any

16   requested financial information.

17        You shall not incur any new credit card charges or

18   open additional lines of credit without the approval of the

19   probation officer.

20        You shall submit your person, place of business,

21   vehicle and any other property -- computers, electronic

22   communications, data storage devices and/or media -- under your

23   control to a search on the basis that the probation officer has

24   reasonable suspicion that contraband or evidence of a violation

25   of the conditions of release may be found.  The search must be

F5C8JOHS

1    conducted at a reasonable time and in a reasonable manner.

2    Failure to submit to a search may be grounds for revocation.

3    You shall inform other residents that the premises may be

4    subject to search pursuant to this condition.

5         You shall report to the nearest probation office

6    within 72 hours of release from custody.

7         You shall make restitution in the amount of $2,225,807

8    in accordance with the proposed order of restitution which has

9    been tendered to the Court.

10        Is there any objection, Mr. Flood?

11        MR. FLOOD:  No.

12        THE COURT:  I will sign the order of restitution and

13   it is so ordered.

14        Based on limited assets, limited earning ability, the

15   fine is waived, and particularly based on the need to make

16   restitution.

17        It is further ordered that you shall pay to the United

18   States a special assessment of $100, which shall be due

19   immediately.

20        You shall forfeit to the United States a sum of money

21   equal to 2.5 million in U.S. currency representing the amounts

22   of proceeds obtained, directly or indirectly, as a result of

23   the offense.

24        Mr. Flood, any objection to the proposed consent

25   preliminary order of forfeiture money judgment?

1          MR. FLOOD:  No, sir.

2          We will be seeking that the restoration program from

3     the Department of Justice apply the forfeiture payments to

4     restitution.

5          THE COURT:  That is something that you will apply to

6     the Department of Justice on, is that correct?

7          MR. FLOOD:  I believe that's automatic.  I am putting

8     the government on notice of that.

9          THE COURT:  Any objection to the preliminary order of

10    forfeiture as to the submarine?

11         MR. FLOOD:  No.

12         THE COURT:  I am signing that.

13         Mr. Re, you have the right to appeal the sentence I

14    have imposed on you.  If you cannot afford the cost of an

15    appeal, you may apply for leave to appeal as a poor person.

16    The time limits for filing a notice of appeal are brief and

17    they are strictly enforced.  If you request, the clerk of court

18    will prepare and file a notice of appeal on your behalf

19    immediately.

20         Do you understand that?

21         THE DEFENDANT:  Yes.

22         THE COURT:  I will recommend that the Bureau of

23    Prisons evaluate Mr. Re for appropriate physical and mental

24    health treatment.

25         A designation request, Mr. Flood?

F5C8JOHS

1    MR. FLOOD:  We would like the Court to recommend that

2    he be housed as close as possible, consistent with his

3    designation score, to the eastern end of Long Island where his

4    family resides.

5    THE COURT:  So recommended.

6    The defendant is remanded in view of the risk and

7    danger that there could be self-injury, which I will not take.

8    So the defendant is remanded.

9    MR. FLOOD:  We ask the Court to reconsider that.  He

10   has been on pretrial release now for quite some time, I believe

11   over a year.  His performance has been excellent.  He has had

12   no issues while on pretrial release whatsoever.  I don't know

13   the government's position on this, but to get his affairs in

14   order we would ask for a surrender date.

15   THE COURT:  The fact of the matter is the defendant

16   entered a guilty plea on December 1, 2014.  Up until today his

17   fate was unknown.  He urged, and I understand, he urged a

18   nonincarceratory sentence, and he has now learned his fate.  My

19   concern is about his physical well-being, and I am not prepared

20   to take the risk.

21   Any objection by the government to remand?

22   MR. ADAMS:  No, your Honor.

23   THE COURT:  Anything further from the government?

24   MR. ADAMS:  No, your Honor.

25   THE COURT:  Any open counts?

1          MR. ADAMS:  There are none.

2          THE COURT:  Anything further from the defendant?

3          MR. FLOOD:  No.

4          THE COURT:  We are adjourned.

5                              oOo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25